## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER DiFONZO | No. 25-cv-2600 |
| *Plaintiff,* | **SECOND AMENDED COMPLAINT** |
| v. | |
| UNICOIN, INC. and ALEX KONANYKHIN, individually, | |
| *Defendants.* | |

Plaintiff Christopher DiFonzo (DiFonzo), by his attorneys, Granovsky & Sundaresh PLLC, as and for his Second Amended Complaint against Defendants Unicoin, Inc. ("Unicoin") and Alex Konanykhin:

### NATURE OF THE COMPLAINT

1. Unicoin is an early-stage startup cryptocurrency company. Unicoin and Konanykhin retained DiFonzo as Chief Commercial Officer to manage the Unicoin's cryptocurrency approval within the Canadian market, increase its overall awareness of media relationships in Canada and the US, and investigate partnerships to increase retail investment throughout the world.

2. Because Unicoin is a startup company, DiFonzo agreed to be compensated partly in cash and partly in Unicoin's cryptocurrency offering.

3. DiFonzo performed work for Defendants through and including September 2024.

4. Despite this, Defendants never fulfilled their unequivocal contractual and legal obligation to compensate DiFonzo.

5. In addition to its refusal to compensate Mr. DiFonzo for his work, Unicoin also refused and failed to reimburse DiFonzo for his business expenses.

6. Konanykhin is the founder and CEO of Unicoin, which has caused Unicoin to breach its monetary obligations to DiFonzo. Konanykhin also participated in negotiations with DiFonzo, misrepresenting and omitting multiple pieces of material information related to Unicoin's payment of wages and issuance of cryptocurrency to DiFonzo.

7. Konanykhin, among others, is personally aware of the work performed by DiFonzo for Defendants.

## **PARTIES**

8. Plaintiff DiFonzo is an individual who currently resides in Oakville, Ontario, Canada. He is a citizen of Canada.

9. Unicoin is a Delaware Corporation whose principal place of business and headquarters is 1 World Trade Center, 85th Floor, Park Avenue South, New York, New York 10007. Unicoin is authorized to and does do business in the State of New York and is listed on the New York State Department of State Division of Coprorations.

10. Defendant Konanykhin is an individual who resides in New York City and serves as the chief executive officer of Unicoin. Upon information and belief, Mr. Konanykhin is a citizen of the State of New York.

11. Defendant Unicoin claims to be "the official cryptocurrency of Unicorn Hunters" and "Next-generation crypto curated by global business leaders."

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states or countries – specifically, Mr. DiFonzo is a citizen of Canada, while Defendants are both citizens of New York.

13. Defendants expressly contemplated Plaintiff's relocation to the United States as part of his appointment to the executive team as Chief Commercial Officer of Unicoin. Multiple written communications from Defendant Konanykhin confirm that New York was the expected locus of performance, and Konanykhin specifically discussed the use of an L-2 visa as the most appropriate immigration pathway for Plaintiff's relocation. Plaintiff's position was originally offered as a payroll employment role equal to and alongside other C-suite executives, but when Konanykhin later realized he could not legally execute that structure, the role was shifted to a consulting arrangement. Plaintiff also traveled to New York repeatedly at Defendants' request. Although Defendants operated virtually, with executives dispersed across the United States and South America, they were consistently anchored to New York, where Konanykhin maintained his home and where Unicoin listed its official business address. To date, Unicoin continues to hold itself out as a company headquartered in New York City.

14. Per their working agreement, Plaintiff held himself out, and was held out by Defendants, as working out of Defendants' New York Office, as did nearly all of Defendants' employees and contractors. Per their working agreement, Plaintiff held

himself out, and was held out by Defendants, as working from Defendants' New York base of operations, consistent with how all executives and contractors were presented. In practice, Defendants operated with a hub-and-spoke system with Konanykhin at the center working out of New York City; co-founder and former CEO Sylvia Moschini and Chief Investment Officer Alex Dominguez working in Miami; former General Counsel Richard Devlin worked from Pennsylvania; Chief Financial Officer Andrew Winn worked in California and Florida; and Mariano Dall'Orso was in South America. Despite this geographic spread, Unicoin consistently represented itself and its workforce as operating from its New York headquarters. Plaintiff's work—including major assignments such as leading the Benzinga Media project in Detroit—was consistently presented to third parties as originating from Defendants' U.S. operations in New York. Defendants further refused to structure Plaintiff's compensation under Canadian tax law.

15. The venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District. Defendant Unicoin, Inc. maintains its principal place of business in this District, and, upon information and belief, Defendant Konanykhin maintains his principal place of residence and citizenship in New York.

## FACTUAL ALLEGATIONS

16. Plaintiff was introduced to Defendants on or about March 2023. During their initial introduction, Plaintiff informed Unicoin via their media relations head in South America about media buying in Canada.

17. After the initial meeting, Defendants informally offered Plaintiff commissions for bringing deals and media opportunities to Defendants.

18. On or around November 2023, Plaintiff facilitated Unicoin's participation as the title sponsor of Benzinga's 2023 Future of Fintech Conference in New York City, held on November 13th and 14th.  Through Plaintiff's efforts, Unicoin secured the title sponsorship at a 50% reduction in fees, along with substantial media coverage from Benzinga as part of the agreement. During this time, Defendant Konanykhin directly engaged in talks with Plaintiff to formalize Plaintiff's role with Defendants.

19. Following the successful execution of the event, Defendant Konanykhin expressed to Plaintiff and the team that this sponsorship was the most effective and valuable investment in any trade show he had sponsored to date. Konanykhin told Plaintiff that the performance at Benzinga demonstrated the value he was seeking in an executive and asked Plaintiff to consider formally joining Unicoin's executive team.

20. On December 27, 2023, Defendants made a written offer of employment with Unicoin as the Chief Commercial Officer.

21. Upon information and belief Defendant Konanykhin also informed Unicoin's management team that DiFonzo was joining the organization.

22. Over the next several days, the parties confirmed the details of Plaintiff's engagement by Defendants.

23. On December 27, 2023, Defendant Konanykhin, using his personal Gmail account, personally offered Plaintiff the position of Chief Commercial Officer, with compensation consisting of monthly cash payments of $14,600 (equivalent to

$175,000 annually), plus an allocation of Unicoins. He informed Unicoin management of this arrangement and directed his CFO to begin onboarding Plaintiff.

24. In early January 2024, Defendant Konanykhin invited Plaintiff to meet with Defendants' executive team. At that meeting, Konanykhin introduced Plaintiff as Unicoin's Chief Commercial Officer, announced Plaintiff's role and responsibilities, and integrated Plaintiff into the executive team. Plaintiff was added to Unicoin's executive strategy WhatsApp group where contracts and company initiatives were discussed, included in all major executive meetings, and directed to negotiate and lead meetings on behalf of Defendants with partners such as Benzinga Media, Miller Thompson, and other investors. Konanykhin also took Plaintiff to the New York Stock Exchange to meet Vince Molinari, presenting Plaintiff to third parties as Unicoin's Chief Commercial Officer.  At no time did Konanykhin present Plaintiff as an outside contractor.

25. Defendant Konanykhin has variously referred to himself and Unicoin interchangeably.  In one quote available through the Unicoin website, Mr. Konanykhin states, "fortunately, the SEC doesn't have global jurisdiction.  I'm not a US citizen, and if a Swiss company deals with non-US investors, the SEC cannot interfere.  That's why we plan to launch the ICO through Unicoin International."[1]

26. On December 29, Plaintiff emailed Defendant Konanykhin to confirm the details of their arrangement, which the Defendant Konanykhin confirmed on behalf of himself and Unicoin.

---

[1] <https://blockleaders.io/whats-next-for-unicoin-as-sec-pressure-mounts-konanykhin-looks-to-switzerland/>, link accessed via <https://unicoin.com/persecution>.

27. Shortly after reaching an agreement, Defendant Konanykhin informed DiFonzo that he could not be an employee due to unspecified "legal reasons" and instead suggested an independent contractor consulting arrangement with the same terms and conditions of employment. The parties confirmed these terms via WhatsApp and e-mail.

28. In response, DiFonzo forwarded a draft consulting agreement to Defendants (the "Agreement"). The Agreement included $14,600 in monthly consulting fees, plus an additional 25,000 coins per month, 10%-cash commission for cash deals, and 10%-coin commission for any real estate deals.

29. Per the terms of the Agreement, Plaintiff was to be compensated $14,600 per month, plus 75,000 coins (which Defendants valued at $0.50 per coin) from January through March 2024, and 150,000 coins (which Defendants valued at $0.75 per coin) from April through September 2024.

30. Presentations made by Unicoin to potential investors and industry partners indicated similar valuations. These presentations also described the coins as "equity backed, dividend-paying cryptocurrency."

31. Sales made by Unicoin, including, but not limited to, Ms. Cipriani and members of her family, also used similar valuations for Unicoin's coin offering.

32. Thus, the total value of the coin owed to Plaintiff is equal to 75,000 coin at $0.50 per coin ($37,500) plus 150,000 coin at $0.75 per coin ($112,500), or $150,000.00. None of this has been paid to Plaintiff. Defendants have sold Unicoin to investors for cash value, up to and including $0.50 and $0.75 per coin.

33. The parties confirmed the financial terms via WhatsApp and e-mail.  In addition, in communications between December 27, 2023 and January 5, 2024, Defendant Konanykhin expressly acknowledged the financial terms of Plaintiff's engagement, including the cash and coin components, and directed Plaintiff to commence performance.

34. On January 2nd, Defendant Konanykhin asked Unicoin's CFO, Andrew Winn, to lead the process to onboard Plaintiff.

35. Shortly thereafter, on January 3, 2024, Plaintiff commenced work for the Defendants, and the Defendants repeatedly confirmed their financial arrangement as stated in the Agreement.

36. By January 5, Plaintiff was already making travel arrangements for himself to meet with Defendant Konanykhin.  He took four business trips to Miami and New York City to meet with Defendant Konanykhin.  Plaintiff was not reimbursed for his out-of-pocket expenses for these business trips.

37. DiFonzo's responsibilities included significant strategic projects such as:

    a. Leading a brand awareness and capital raise project in collaboration with Benzinga Media;

    b. Proposing a coin-for-equity swap targeting small-cap companies;

    c. Engaging Miller Thompson, a Canadian law firm, to facilitate registration and legal trading of Defendants' coins in Canada;

    d. Initiating collaboration with the global real estate brokerage Engel & Völkers to identify and present real estate properties for the 140 Program;

    e.  Contacting Caribbean governments to discuss Unicoin's launch of a global office on their islands. This included exploring opportunities to develop government-owned lands in Unicoin's real estate 140 Program;

    f.  Engaging with Deltec Bank in the Bahamas, Del Chain Digital Assets Group to establish a global banking relationship, and the International Bank of Commerce for Unicoin;

    g.  Conducting introductory meetings with RBC, TD Bank, Fidelity Investments, the Beringer Capital Group, and other mid-sized institutions to build relationships aligned with Unicoin's evolving investment strategy;

    h.  Leading in-depth discussions with Patrick Rooney, a high-net-worth investor, and facilitated an introduction to One Capital Management's principal. Including exploring opportunities for a board of directors position and institutional investment;

    i.  Conducting media relations outreach to targeted publications such as *The Wall Street Journal*, *Robb Report Magazine*, and various global real estate magazines to build awareness and advertising opportunities for Unicoin's real estate 140 Program; and

    j.  Creating a proposal for Michael Turpin and his consulting group, Transform Ventures, to assist in developing a comprehensive marketing strategy for Unicoin. The proposal also includes the potential launch of a second coin to enhance the company's market positioning and expand its cryptocurrency offerings.

38. Additionally, DiFonzo contacted and engaged with over 70 global cryptocurrency exchanges to determine whether listing Unicoin on their platforms would be strategically beneficial. Many of these exchanges were based in Asia, requiring DiFonzo to participate in calls between 11:00 PM and 3:00 AM.

39. It became clear that Plaintiff was going to be tasked with an enormous amount of work for the Defendants, so while on a trip to Miami, Defendant suggested that Plaintiff take on an assistant. On Sunday, January 14th, Plaintiff discussed the assistant with Defendant Konanykhin. At that time, they confirmed the individual,

Marilena Cipriani, and the rate ($30 per hour (USD)) for the assistant's services, and she would begin as soon as possible.

40. It became clear that Plaintiff was going to be tasked with an enormous amount of work for Defendants. Specifically, Defendant Konanykhin directed Plaintiff to design and execute a capital-raising strategy with a target range of $10 million on the low end and up to $300 million on the high end — amounts exceeding any prior fundraising achieved by Defendants. Plaintiff developed strategic plans consistent with his professional training and prior experience leading Fortune 500 initiatives and owning his own firms. However, Konanykhin declined to commit the organizational resources or investment required to execute such a program. Instead, he expected Plaintiff, without meaningful support, to leverage his personal contacts to bring in outside investors for Unicoin.

41. The magnitude of these expectations were confirmed during a January 2024 trip to New York, when Plaintiff received a phone call from Unicoin's CFO, Andrew Wynn, while accompanied by intern Hugh Smith. During that call, Wynn asked Plaintiff whether he truly understood "what [he] had signed up for." When Plaintiff confirmed that he was tasked with raising between $10 million and $300 million, Wynn replied, "Do you realize if you do that you will single-handedly save the company?"

42. In January 2024, Defendant Konanykhin explicitly instructed Plaintiff to hire an assistant, Marilena Cipriani, and dictated her hourly pay rate via WhatsApp.

43. Initially, Konanykhin offered to pay Ms. Cipriani directly, but then indicated that she should bill for her time through Plaintiff, which she did. Konanykhin presented this

arrangement solely as an administrative convenience, similar to the way Plaintiff's own compensation was processed, and was not intended to suggest that Ms. Cipriani worked for Plaintiff personally. Both Plaintiff and Ms. Cipriani were treated and held out as independent staff of Unicoin.

44. Ms. Cipriani was integrated into Unicoin's operations — receiving company NDAs, Unicoin email credentials, and appearing on internal staff communications. She worked directly with Unicoin's South America–based employees, participated in media partnership recommendations, and supported operational issues such as resolving a company-wide email outage. She also collaborated with other Unicoin staff, including Joseph Polino (a sales employee married to Konanykhin's niece, both of whom often resided with Konanykhin) and Eduardo, a Miami-based real estate attorney retained by Unicoin.

45. Plaintiff, like Ms. Cipriani, was directed to adopt Unicoin branding, including an official Unicoin email address and updating his LinkedIn profile to reflect his Chief Commercial Officer role.

46. Ms. Cipriani worked directly for Defendants, often without Plaintiff's input or knowledge. She simply billed through Plaintiff.

47. Defendants directly authorized and approved Ms. Cipriani's work.

48. Ms. Cipriani began on January 18, 2024. She worked an average of 8 hours a day with a 1-hour lunch.

49. Plaintiff was reimbursed for the cost of Ms. Cipriani's services, like his other expenses through May. After that, Defendant ceased reimbursing expenses, leaving Plaintiff

to bear the costs personally despite Konanykhin's express authorization of her hire and the fact that she was working for Unicoin.

50. Plaintiff provided Defendants with regularly updated status reports detailing his work.

51. Between January 2024 and June 2024, the parties engaged in a course of dealing where Defendants paid Plaintiff his agreed-upon monthly rate as well as some of his business expenses.

52. 46. In or about July 2024, Defendant Konanykhin suggested to Plaintiff that because Unicoin was only "a month or two away" from its planned ICO (and eventual IPO), Plaintiff stood to earn significant compensation from the accumulated Unicoins. On that basis, Konanykhin requested that Plaintiff consider restructuring his cash compensation to reduce Unicoin's outflow in the months leading up to the ICO. In response to this request, Plaintiff emailed Konanykhin with a proposal to wind down the contract in an orderly fashion. Plaintiff's proposal was never accepted or acknowledged by Defendants.

53. Defendants continued to treat Plaintiff as an active member of their executive team throughout August and September, with Konaykhin personally checking in with Plaintiff on the status of his ongoing Unicoin projects. When advised of Plaintiff's progress, Konanykhin raised no objection and did not instruct Plaintiff to cease work. Instead, Defendants continued to engage with Plaintiff on project execution, invoicing, and compensation matters, confirming that the relationship persisted beyond July and into September 2024.

54. Plaintiff continued to perform substantial work for Defendants throughout August and September 2024. During this time, Plaintiff's work included negotiations with U.S. real estate partners, discussions with cryptocurrency exchanges, coordination with Unicoin's staff, and active supervision of Unicoin's projects. Defendant Konanykhin himself remained engaged, checking in with Plaintiff via WhatsApp regarding his ongoing work.

55. Plaintiff has numerous messages, telephone logs, and documentary records confirming that Defendants knew of, permitted, and benefited from Plaintiff's continued work into September 2024. Plaintiff and Ms. Cipriani's workload only tapered in mid-September following the Securities and Exchange Commission's enforcement action against Unicoin, at which point Konanykhin relocated to Italy and later publicly announced that Unicoin would be moving its global headquarters to Switzerland for regulatory reasons.

56. Despite Plaintiff DiFonzo fulfilling his contractual obligations, the Defendants failed to pay Plaintiff for July, August, and September 2024, amounting to $43,800 in unpaid cash compensation.

57. Defendants also failed to provide the coins Plaintiff had earned, as per the terms of their agreement.

58. Between September 10–13, 2024, Plaintiff and Konanykhin discussed the delay of Plaintiff's July's payment, Unicoin invoicing errors, and the allocation of Plaintiff's monthly $30,000 compensation and coin distributions. Konanykhin instructed Plaintiff to coordinate with CFO Andrew Winn to finalize payments, explicitly

13

recognizing Plaintiff's entitlement. Later, Konanykhin acknowledged that the SEC had halted Unicoin's ICO, while Plaintiff noted he was still awaiting payment for his invoices. Defendants' own words confirm that Plaintiff continued performing work through September 2024 and that Defendants knowingly benefited from that work. Only months later, in November 2024, did Konanykhin attempt to retroactively deny Plaintiff's ongoing role.

59. Plaintiff also incurred reimbursable expenses totaling $7,903.43, including travel, accommodations, and office costs and an additional $23,130 in hourly wages. Defendants have failed to reimburse Plaintiff for these expenses despite receiving detailed invoices and supporting documentation.

60. From August through early December 2024, Plaintiff communicated with the Defendants and their representatives, including Defendant Konanykhin (via WhatsApp and e-mail) and Andrew Winn (via WhatsApp and e-mail), to resolve the outstanding payments. The information was also shared with Richard Devlin, Defendant's General Counsel. These communications included detailed reconciliations of all outstanding amounts owed and the corresponding receipts.

61. Defendants expressly acknowledged their payment obligations but failed to make payment, leaving Plaintiff with no choice but to seek legal recourse.

62. Despite Plaintiff's full performance of his contractual obligations, Defendants failed to pay the agreed-upon wages and reimburse Plaintiff for his expenses in violation of New York City's Freelance Isn't Free Act (NYC Administrative Code § 20-927 et seq.).

63. As a result of the Defendants' failure to pay, Plaintiff is owed a total of $224,833.43 in unpaid cash wages, unpaid coin, and unreimbursed expenses, exclusive of liquidated damages, interest, attorney's fees, and costs.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION - VIOLATION OF NYC FREELANCE ISN'T FREE ACT (NYC Admin. Code §20-929)

64. Plaintiff repeats and realleges the allegations outlined in the preceding paragraphs as if fully set forth herein.

65. At all relevant times, Defendants Unicoin and Konanykhin were hiring parties within the meaning of the Freelance isn't Free Act ("FIFA").

66. Defendant Konanykhin was a "hiring party" within the meaning of FIFA. He personally negotiated and approved Plaintiff's engagement, directly authorized staffing and expenses, and conducted critical negotiations via his personal Gmail and WhatsApp accounts.

67. DiFonzo was a freelance worker within the meaning of FIFA at all relevant times.

68. Pursuant to § 20-929 of the New York City Administrative Code, a hiring party must pay the freelance worker the contracted compensation on or before the date such compensation is due under the terms of the contract.

69. Unicoin and Konanykhin violated § 20-929 of the New York City Administrative Code by failing to pay DiFonzo in accordance with the agreement the parties had reached.

70. Under § 20-933(b)(3) of the New York City Administrative Code, hiring parties who violate § 20-929 are liable to the freelance worker in the amount of double damages, injunctive relief, and other remedies as may be appropriate.

71. By the foregoing reasons, Unicoin and Konanykhin are liable to DiFonzo in the amount to be determined at trial but no less than $449,666.86 (representing double damages, plus double damages for applicable tax gross-up), plus attorneys' fees, and any other damages permitted under FIFA.

## SECOND CAUSE OF ACTION - BREACH OF CONTRACT

72. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

73. Defendants entered into a binding agreement with Plaintiff to pay for services and reimburse expenses – the Agreement.

74. Even absent a formal signed contract, Defendants repeatedly confirmed the agreed terms in writing and by their conduct. Plaintiff fully performed services, and Defendants accepted the benefits.

75. Defendants breached the Agreement by failing to make the required payments.

76. Plaintiff has suffered damages as a result of the Defendants' breach in an amount to be determined at trial but not less than $224,833.43, plus interest and costs.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Christopher DiFonzo requests that this Court enter judgment against Defendants Unicoin and Konanykhin and in favor of DiFonzo as follows:

A. Entering judgment against all Defendants and in favor of DiFonzo on each and every cause of action herein;

B. Entering an award of compensatory damages in an amount to be determined at trial but in no event less than $224,833.43 in unpaid cash and coin or currently higher value owed in relation to the value of the promised cryptocurrency interests;

C. Entering judgment against Defendants and in favor of DiFonzo for pre-judgment and post-judgment interest, double damages pursuant to relevant statutes and administrative rules, and the costs and attorneys' fees associated with bringing this action and the FIFA Action;

D. Entering judgment against Defendants and in favor of DiFonzo in such additional amounts as are necessary pursuant to its indemnification to DiFonzo for all taxes associated with Defendants' obligations to DiFonzo; and

E. Such other and further relief as to this Court appears necessary and proper.

September 2, 2025

Respectfully Submitted,

GRANOVSKY & SUNDARESH PLLC

*/s/ Alex Granovsky*

Alexander Granovsky
48 Wall Street / New York, NY 10005
ag@g-s-law.com
(646) 524-6001

*Attorneys for Plaintiff CHRISTOPHER
DiFONZO*

18